# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **Michael Brown, Sr. and Lesley McSpadden,** | |
| **Plaintiffs,** | |
| **vs.** | **Cause No:**    **4:15-cv-00831-ERW** |
| **City of Ferguson, Missouri; Former Police Chief Thomas Jackson; and Former Police Officer Darren Wilson,** | |
| **Defendants.** | |

## FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH

**COME NOW** Plaintiffs, by and through their undersigned counsel, and hereby state the following in support of their First Amended Complaint for Wrongful Death against the above-named Defendants:

### INTRODUCTION

This is a civil action filed pursuant to section 537.080 et seq. R.S.Mo. (1979), which is commonly referred to as the state of Missouri's Wrongful Death Statute. Plaintiffs, Lesley McSpadden and Michael Brown, Sr. ("Plaintiffs"), are the surviving natural parents of Michael O. D. Brown, Jr. ("MBJ"). Plaintiffs are the only members of the wrongful death class eligible to advance this suit. MBJ was an unarmed, eighteen year-old, African-American male who sustained fatal gunshot wounds to his head and body on August 9, 2014. Defendant Police Officer Darren Wilson ("Defendant Wilson" or "Wilson") unjustifiably shot and killed MBJ, using an unnecessary and unreasonable amount of force in violation of MBJ's

constitutionally guaranteed right to life. Defendant Wilson was employed by Defendant City of Ferguson, Missouri ("Defendant City" or "FPD") at the time that he shot and killed unarmed eighteen year-old MBJ.

Defendant Police Chief Thomas Jackson ("Defendant Jackson" or "Jackson") maintained general supervision of Defendant Wilson, and was also responsible for his hiring, training, and retention, along with Defendant City. Acting under color of law, Defendant Wilson deprived MBJ of his well-established civil rights protected both by the United States Constitution and the state of Missouri Constitution. Plaintiffs seek compensatory and exemplary damages, declaratory and injunctive relief, and attorneys' fees and costs, in addition to any other relief this Honorable Court deems just and proper under the circumstances.

## PARTIES

1)      Plaintiffs are the natural parents of decedent MBJ.

2)      At all material times herein, Plaintiffs and MBJ resided in St. Louis County, Missouri.

3)      Defendant City at all pertinent times herein was a duly chartered municipality of St. Louis County, Missouri.

4)      The Ferguson Police Department is an official division of Defendant City.

5)      At all relevant times herein, Defendant City employed Defendants Jackson and Wilson, identified more fully *infra*, including at the time Defendant Wilson shot and killed MBJ.

6)      Defendant Wilson at all pertinent times herein was acting within the course and scope of his employment with Defendant City and was acting under color of law.

7)       Defendant Wilson is being sued in his individual capacities.

8)       Defendant Jackson at all pertinent times herein was acting within the course and scope of his employment with Defendant City and was acting under color of law as the supervisor of Defendant City's police officers, including Defendant Wilson.

9)       Defendant Jackson was responsible for and had express and implied authority to make policies for Defendant City.

10)      Defendant Jackson also had the authority to hire, train, supervise, discipline, and effect the retention determination(s) in regard to Defendant City's law enforcement officers.

11)      Defendant Jackson is being sued in his individual capacities.

## VENUE

12)      Venue is proper in this judicial circuit because all acts or omissions complained of occurred herein.  Venue is also proper pursuant to V.A.M.S. § 508.010 and the Constitution of the state of Missouri.  Plaintiffs are the proper parties to bring this action for the wrongful death of their son, MBJ.

## SUBJECT-MATTER JURISDICTION

13)      This Court has subject-matter jurisdiction over the claims herein pursuant to MO Const. Art. V, § 14.

**COMMON FACTUAL ALLEGATIONS**

14)     On August 9, 2014, at approximately 12:00 p.m., MBJ and Mr. Dorian Johnson ("Witness Johnson"), two African-American males, were walking on Canfield Drive, a public street located in the city of Ferguson, Missouri.  While walking, the two males crossed the street at a slight angle in an eastward direction toward the Canfield Apartments complex.

15)     The weather in the area on this Saturday afternoon was clear, sunny, and dry.

16)     At the relevant time period germane to the events giving rise to this suit, a limited amount of vehicle traffic was present on Canfield Drive.  MBJ and Witness Johnson were not impeding or slowing the traffic by crossing the street.

17)     As MBJ and Witness Johnson reached the center of the street, Defendant Wilson approached them from the west side of Canfield Drive in a marked patrol vehicle.

18)     Defendant Wilson stopped his patrol vehicle within inches of MBJ and Witness Johnson and ordered them to "Get the f*&k" out of the street or on the sidewalk.

19)     The use of such aggressive profanity caused an unnecessary and unwarranted escalation of this interaction.

20)     Such use also is indicative of the aggressive mindset of Defendant Wilson toward some citizens in situations that begin as non-threatening or innocuous.

21)     Ordering them to "Get the f*&k" out of the street, or on the sidewalk, is consistent with Defendant Wilson's pattern of unprofessional speech and is commonly known to set the stage for an aggressive encounter with him and/or the excessive use of force that followed herein.

22)    Without the use of such unnecessary and unwarranted profane language by Defendant Wilson, the initial encounter with MBJ and Witness Johnson would have been uneventful.

23)    But instead, Defendant Wilson's aggressive, disrespectful, and profane language escalated this encounter into an event that has garnered worldwide attention.

24)    MBJ was closer to Defendant Wilson's car door than was Witness Johnson as Defendant Wilson's vehicle passed them.

25)    Even though MBJ could have easily attacked Defendant Wilson while standing within inches from his police vehicle, MBJ made no attempt to physically engage Defendant Wilson in any manner whatsoever.

26)    Defendant Wilson then proceeded west on Canfield Drive after shouting the aforementioned profane order at both MBJ and Witness Johnson.

27)    Defendant Wilson traveled several yards westward, away from MBJ and Witness Johnson, when he suddenly stopped his vehicle, placed it in reverse, and drove back to where MBJ and Witness Johnson were continuing to walk.

28)    Defendant Wilson turned his vehicle at an angle, or semi-perpendicular to the street, using his vehicle as a weapon of unjustified force and thereby causing it to blockade and impede the walking path of MBJ and Witness Johnson thereby limiting and/or impeding their movement.

29)    Defendant Wilson's vehicle stopped only inches from MBJ's body.

30)    The use of his vehicle as an intimidating weapon or act of threatening force constituted yet another unnecessary and unwarranted escalation of this encounter.

31)     At that moment, Defendant Wilson unjustifiably and unreasonably stopped and/or detained MBJ.

32)     Defendant Wilson did not offer any lawful reason or explanation for stopping and/or detaining MBJ.

33)     Nor did he offer any lawful reason or explanation for using his vehicle as a large and threatening weapon to block and halt their progress toward walking home.

34)     Defendant Wilson unreasonably and unjustifiably used force again, when, without warning, provocation, or justification, he pushed his car door open with such force that it struck MBJ's body.

35)     When the door struck MBJ's body it ricocheted back upon Defendant Wilson.

36)     Appearing highly upset by the ricochet of his door, Defendant Wilson, again, used unwarranted physical force when he reached through the car window, grabbing MBJ's clothing and body.

37)     In the midst of grabbing MBJ's clothing and body, Defendant Wilson drew his weapon and pointed it at MBJ.

38)     MBJ desperately attempted to break-free from Defendant Wilson's unlawful encounter in an effort to protect himself from further physical force by Defendant Wilson, including being shot.

39)     During MBJ's frantic effort to remain alive, Defendant Wilson fired one unlawful and unjustified gunshot from inside of his patrol vehicle, during which time MBJ sustained a significant gunshot wound to his right hand.

40)     MBJ eventually broke-free from Defendant Wilson, only after being shot, and began to flee on foot in an attempt to preserve both his life and to seek safety.

41)     Defendant Wilson fired at least one more shot as MBJ and Witness Johnson were fleeing from the police vehicle.

42)     With his gun drawn, Defendant Wilson began to chase a fleeing and wounded MBJ on Canfield Drive.

43)     At one point, MBJ's body seemed to suddenly jolt either from receiving and/or hearing an additional shot(s), which rang out as he was fleeing with his back to Defendant Wilson.

44)     After running for several yards, MBJ appeared to realize that he was badly bleeding and vulnerable to imminent death or more bodily harm by Defendant Wilson.

45)     In a final attempt to protect himself, and prevent additional bodily harm and/or imminent death, MBJ turned around and raised his hands in a non-threatening manner.

46)     Upon information and belief, MBJ conveyed the following statement to Defendant Wilson: "Don't shoot. I don't have a gun. I'm unarmed."

47)     Throughout the entire ordeal, Defendant Wilson never ordered MBJ to "stop" or "freeze."

48)     Defendant Wilson issued no verbal commands, other than his initial order to "Get the f**k" on the sidewalk.

49)     According to several eye-witnesses, MBJ did not pose any threat to Defendant Wilson.

50)     These eyewitness accounts are corroborated by the fact that MBJ was unarmed throughout the entire incident, badly bleeding, and attempting to flee for safety moments before being gunned down by Defendant Wilson.

51)     While unarmed and showing no threat by a deadly weapon, Defendant Wilson fired a volley of shots at MBJ that struck him in the body, face, and head.

52)     Defendant Wilson shot approximately twelve times throughout the incident in violation of MBJ's constitutionally guaranteed rights to (1) be free from the use of excessive force, (2) the right to life, (3) due process under the law, and (4) equal protection under the law.

53)     The six to eight shots that struck MBJ's body, including two shots to the head, actually and proximately caused his death.

54)      Prior to his death, MBJ endured a substantial amount of conscious pain and suffering from the moment he was first shot by Defendant Wilson until his body ultimately succumbed to death by six to eight fatal bullets.

55)     MBJ's lifeless body remained on the ground in an undignified manner for hours as blood streamed from his head, arm, and torso onto Canfield Drive while his family, including Plaintiffs, and the community watched in despair and disbelief.

56)     Defendant Wilson's supervisor arrived at the scene shortly after unarmed MBJ was shot and killed.

57)     While on the scene, Defendant Wilson's supervisor inquired into the details, to which Defendant Wilson provided the supervisor a first-hand account of what led to the killing of MBJ.

58)     Consistent with multiple witnesses, Defendant Wilson told his supervisor, among other things, that MBJ had his arms up moments before he shot and killed him.

59)     While at the scene, Defendant Wilson never told his supervisor that MBJ placed his right hand in his waistband, suggesting that MBJ had a weapon.

60)     While at the scene, Defendant Wilson never told his supervisor that he suspected MBJ of any prior incidents other than walking "in the street."

61)     Defendant Wilson's supervisor allowed Defendant Wilson to leave the scene of the shooting unescorted and unaccompanied.

62)     Defendant Wilson returned to the police station and began destroying evidence and interfering with the investigation.

63)     Defendant Wilson washed blood off his hands.

64)     Defendant Wilson cleared and bagged the gun he used to shoot and kill MJB.

65)     Defendant Wilson did some of these things in the presence of his former supervising and training officer, who also was his fiancé.

66)     As such, Defendant Wilson tampered with critical pieces of evidence by destroying potential gun residue on his hands, blood, and/or DNA evidence, as well as compromising the integrity of his weapon, which had significantly probative evidentiary value.

67)     Defendant Wilson failed to undergo, and Defendant City failed to conduct, a proper, fair, and impartial investigation into the killing of MBJ.  Such failures are consistent with the policy, practice and/or custom of Defendant City and Defendant Jackson to allow misconduct with impunity.

68)     Upon information and belief, Defendant Jackson had knowledge that Defendant Wilson (1) used excessive force against decedent MBJ, (2) attempted to cover it up through a concocted version of events, and (3) otherwise violated his constitutional rights but failed to reprimand him in any way or take corrective measures thereby ratifying and furthering the unconstitutional actions of Defendant Wilson.

69)     Upon information and belief, Defendant Jackson had knowledge that Defendant Wilson tampered with critical pieces of evidence by destroying potential gun residue on his hands, blood, and/or DNA evidence, as well as compromising the integrity of his weapon, which had significant probative evidentiary value, but failed to reprimand him in any way or take corrective measures thereby ratifying and furthering the unconstitutional actions of Defendant Wilson.

70)     Upon information and belief, Defendant Jackson had knowledge that the physical and forensic evidence as well as eyewitness accounts did not comport with Defendant Wilson's concocted account of what led to the killing of MBJ but failed to reprimand him in any way or take corrective measures thereby ratifying and furthering the unconstitutional actions of Defendant Wilson.

71)     Defendant Jackson also had knowledge that Defendant Wilson's fiancé whom is also a law enforcement officer witnessed and/or participated in the destruction of evidence, and/or failed to intervene due to prevent the destruction of and/or tampering with physical evidence yet Defendant Jackson failed to reprimand Defendant Wilson's fiancé in any way or take any corrective measures thereby ratifying her conduct and furthering the unconstitutional actions of Defendant Wilson.

72)     Defendant Jackson created an environment that openly permitted Ferguson officers to engage in the unconstitutional and unlawful conduct as cited above with impunity, and said impunity directly led to the deprivation of constitutional rights of MBJ and other citizens.

73)     Because Defendant Jackson created the aforesaid environment and failed to take any affirmative or corrective measures thereof, he (1) exhibited reckless indifference to the rights of MBJ and the citizens of the City of Ferguson, (2) acted in bad faith and/or (3) acted with a malicious intent to continue the pattern of disparate treatment of African Americans and the use of excessive force.

74)     Defendant City ratified Defendant Wilson's misconduct by failing to reprimand him for (1) interfering with an internal investigation, (2) tampering with evidence, and/or (3) destroying evidence, as well as not reprimanding his fiancé for failing to intervene due to her having witnessed the destruction of and/or tampering with physical evidence.

75)     During the course of the FPD investigation, Defendant Wilson attempted to justify and rationalize the unlawful killing of teenager MBJ by stating that he "looked like a demon" or the "Incredible Hulk," and that MBJ had the "most intense [and] aggressive face I have ever seen" and that MBJ made a "grunting noise."

76)     The linguistic choices uttered by Defendant Wilson indicate that he perceived MBJ to be subhuman or animal-like, or, at times, to possess nonsensical and stereotypic superhuman powers.

77)     Plaintiffs contend that it is never objectively reasonable to perceive a human being as anything less than human.

78)      Defendant Wilson's verbal choices reflect both the pervasive racial-animus and the racially-biased mentality and culture created, promulgated, and ratified by Defendant City, Defendant Jackson, its police officers, supervisors, and support staff.

79)      As discussed more fully, *infra*, such racial-animus and racially-biased mentality was frequently manifested in both thought and ideology, and in both verbal and written forms.

80)      This racial-animus and racially-biased ideology was also manifested in actions such as unconstitutional stops and/or detentions and the excessive use of force against African-American citizens, of which Defendant Jackson and Defendant City had constructive or firsthand knowledge.  Through and with such knowledge Defendant Jackson and Defendant City created, promulgated, and effectively ratified and furthered the goals of said misconduct, which was also bolstered by their failure to intervene or to take any corrective actions.   All of this constitutes ratification of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

81)      The prominence of racial-animus and -bias in decision-making and actions levied against African-American citizens is supported by factual analysis of anecdotal individual incidents and statistical evidence.

82)     For example, Defendant Wilson's actions and linguistic patterns support the United States Department of Justice's (hereinafter USDOJ) finding that Defendant City, and in particular its police department, had a pattern, practice or custom, as well as a policy, of racial bias aimed at African-American citizens that deprived them of their constitutional rights; namely, to be free of racism manifesting in acts of excessive force against their persons and depriving them of the most fundamental of all constitutionally guaranteed rights: the right to life.  Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions.  By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

83)     Moreover, the USDOJ conducted an investigation into the circumstances surrounding the death of MBJ and found that Defendant City engaged in a pattern or practice of racial bias and that avoidable harms were levied against African-American citizens in a disproportionate number.  Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions.  By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

84) The USDOJ concluded that a pattern and practice of unconstitutional stops, detentions, uses of force, and unfair policing in general permeated throughout the Ferguson Police Department (FPD). Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

85) Furthermore, the USDOJ concluded that the FPD's practices are due partly to insidious discrimination, evidenced by racial bias and racial stereotyping utilized by Ferguson police officers toward African-American citizens. Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

86)     The USDOJ concluded further that the FPD's pattern of racial bias results in unconstitutional violations of African-Americans, including vehicle stops without reasonable suspicion, arrests without probable cause, unequal treatment, and the use of unreasonable force, all in violation of the Fourth Amendment and the Fourteenth Amendment of the U.S. Constitution.  Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions.  By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ

**Defendant City Engages in A Pattern and Practice of Unconstitutional Stops, Detentions, and Arrests in Violation of the
Fourth Amendment of the United States Constitution**

87)     Defendant City engages in a pattern and practice of unreasonable stops and detentions lacking reasonable suspicion and unconstitutional arrests lacking probable cause in violation of the Fourth Amendment of the U.S Constitution.  Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions.  By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

88)     Such pattern and practices created a culture of unjustified police conduct within the City, which led directly to the unjustified killing of MBJ.

89) For example, in July 2013, FPD officers encountered an African-American man in a parking lot while on their way to arrest a different person at an apartment building. Police knew that the man they encountered was not the person they sought to arrest.

90) Nonetheless, without reasonable suspicion, police officers handcuffed the man, placed him in the back of a patrol car, and conducted a criminal background check of his record.

91) The FPD officers discovered that man was the arrestee's landlord. The landlord assisted officers in entering the person's unit to conduct the arrest but he later filed a complaint alleging racial discrimination and unlawful detention. An FPD sergeant vigorously defended the officers' actions, characterizing the detention as minimal, despite the fact that even temporary detention constitutes a deprivation of liberty and must be justified under the Fourth Amendment.

92) In October 2012, FPD officers pulled over an African-American man who had lived in the city of Ferguson for sixteen years, claiming that his passenger-side brake light was broken. The driver happened to have had recently replaced the light and knew it to be functioning properly.

93) Nonetheless, according to the man's written complaint, one officer stated, "Let's see how many tickets you're going to get," while a second officer tapped his electronic weapon on the roof of the man's car. The officers cited the man for "tail light/reflector/license plate light out." FPD officers refused to allow the man to demonstrate that his car's equipment functioned properly, warning him, "Don't you get out of that car until you get to your house." The man went to the police station that night to show a sergeant that his brakes and license plate light worked properly and to report that he believed he had been racially profiled.

94)      In another incident, an African-American man was seated at a bus stop near Canfield Drive when an FPD patrol car pulled up abruptly in front of him and a FPD Lieutenant in the vehicle told him to "Get over here."  The bus patron questioned, "Me?"  This FPD Lieutenant responded: "Get the f** over here.  Yeah, you."  The bus patron responded, "Why? What did I do?"  The officer proceeded to demand that the man show him identification, and when he again questioned why he needed to provide identification to the officer, the FPD Lieutenant said, "Stop being a smart ass and give me your ID."  The lieutenant, who had a supervisory role in the FPD, ran the man's name for warrants.  Finding none, he returned the identification and said, "Get the hell out of my face."

95)      During its investigation, the USDOJ discovered that this particular lieutenant had several racially charged allegations filed against him.

96)      The FPD also has a pattern and practice or custom and a policy of unconstitutional stops lacking the requisite legal suspicion described colloquially by FPD as "ped. checks" or "pedestrian checks."

97)      At times, FPD officers use the aforementioned term to refer to reasonable suspicion based pedestrian stops (i.e., "*Terry* stops") but officers refer to the same terminology when stopping a person with no objectively reasonable articulable suspicion.

98)      The USDOJ concluded that the FPD officers invoke the term, "ped. check," as though it has some constitutional legitimacy; however, it has no legal authority because officers may not detain a person, even briefly, without articulable reasonable suspicion.

99)　　Because the FPD failed to track or analyze "ped. checks," or *Terry* Stops," it made that particular use of authority susceptible to a pattern of racial discrimination and unlawful detentions.

100)　　One night in December 2013, FPD officers decided to "ped. check" those "wandering around" in Ferguson's apartment complexes.

101)　　In another December 2013 case, officers responded to a call about a man selling drugs by stopping a group of six African-American youths who did not match the facts of the call. The youths were "detained and ped checked."

102)　　The FPD, as cited *supra*, has a pattern and practice of effectuating arrests without probable cause in violation of the Fourth Amendment.

103)　　Frequently, officers arrest people for conduct that plainly does not meet the elements of the cited offense.

104)　　For example, in November 2013, an officer approached five African-American teenagers listening to music in a vehicle. FPD officers claimed to have smelled marijuana and placed them under arrest for disorderly conduct based upon "gathering in a group for the purposes of committing illegal activity." The officers detained and charged the minors and took some of them to jail, despite having found no marijuana after searching the vehicle.

105)　　Moreover, in February 2012, an FPD officer wrote an arrest notification ticket for peace disturbance for "loud music" ostensibly emanating from a vehicle. Under the law, a third party that was disturbed by the music is a requisite element of the underlying offense. The officer writing the ticket did not assert, nor was there any indication, that a third party was

disturbed; nonetheless, a supervisor approved the arrest ticket. Because the FPD officers failed to base the arrests on probable cause, they violated the citizens' Fourth Amendment rights.

106)    While the record demonstrates a pattern of stops that are improper from the beginning, including Defendant Wilson's stop of MBJ on August 9, 2014, it also exposes encounters that start as constitutionally defensible but become unconstitutional as officers unnecessarily escalate the encounters.

107)    For instance, in the summer of 2012, an officer detained a 32-year-old African-American man who was sitting in his vehicle cooling off after playing basketball. The officer arguably had grounds to stop and question the man, since his windows appeared more tinted than permitted under the city of Ferguson's code. However, the officer proceeded to accuse the man of being a pedophile without cause, prohibited the man from using his cell phone, and ordered the man out of his vehicle for a pat-down, despite having no reason to believe he was armed or a legally justifiable reason to conduct a search of his vehicle.

108)    When the man refused, citing his constitutional rights, the officer reportedly pointed a gun at his head and arrested him. The officer charged the man with eight different counts, including making a false declaration for initially providing the short form of his first name (e.g., "Mike" instead of "Michael") and an address that, though legitimate, differed from the one on his driver's license. The officer also charged the man both with having an expired operator's license and with having no operator's license in his possession.

109)    In addition, the FPD officers routinely abused the "Failure to Comply" and/or "Failure to Obey" charges in violation of the Fourth Amendment of the U.S. Constitution. FPD officers unconstitutionally ordered citizens to "stop" when they are engaging in lawful activity.

The order to stop is not a "lawful order" when an officer lacks reasonable suspicion that criminal activity is afoot. Nonetheless, when individuals do not stop in those situations, FPD officers treat that conduct as a failure to comply with a lawful order and effectuate arrests lacking probable cause by using the pretext of "Failure to Comply" in violation of the Fourth Amendment.

110)     In an incident around August 2010, an FPD officer broke up an altercation between two minors and sent them back to their homes. The officer ordered one to stay inside her residence and the other not to return to the other one's residence.

111)     Later that day the two minors engaged in another altercation outside of the first minor's residence and the FPD officer arrested the minors for failure to comply with his previous order. However, issuance of a "Failure to Comply" order did not empower the officer with the ability to verbally confine the girls to their respective homes or to keep them away from certain locations, and, as such, the order and arrest violated their Fourth Amendment constitutional rights.

112)     In an October 2011 incident, an FPD officer arrested two sisters who were backing their car into their driveway. The officer claimed that the car had been idling in the middle of the street, warranting investigation, while the women claim they had pulled up outside their home to drop someone off when the officer arrived. In any event, the officer arrested one sister for failing to provide her identification when requested. He arrested the other sister for getting out of the car after being ordered to stay inside. The two sisters spent the next three hours in jail in violation of their Fourth Amendment constitutional rights.

113)     In December 2011, FPD police officers approached two people sitting in a vehicle on a public street and asked the driver for identification.  When the driver balked, insisting that he was on a public street and should not have to answer questions, the officers ordered him out of the vehicle, ultimately charging him with Failure to Comply while clearly violating his Fourth Amendment constitutional rights.

114)     In March 2013, FPD officers responded to the police station to take custody of a person wanted on a state warrant.  When they arrived, they encountered a man who was not the subject of the warrant but who happened to be leaving the station.  Officers did not have evidence to connect the man to the warrant subject, other than his presence at the station. Nonetheless, the officers stopped him and instructed him to identify himself.  The man asserted his rights, asking the officers "Why do you need to know?" and declining to be frisked.  When the man then extended his identification toward the officers per their request, the officers interpreted his hand motion as an attempted "assault" and took him to the ground.  Without articulating reasonable suspicion, or any other justification for the initial detention, the officers arrested the man on two counts of Failure to Comply and two counts of Resisting Arrest.

115)     Even more shocking during the USDOJ investigation was an FPD officer admitting that when he conducts a traffic stop he asks for identification from all passengers as a matter of course.  If any person refuses his request, he considers the refusal to be "furtive and aggressive" conduct and typically arrests the person for Failure to Comply.  The FPD officer thus expressly acknowledged that he regularly exceeds his authority under the Fourth Amendment by arresting passengers who refuse, as is their right, to provide identification.

116)     The FPD officer later revealed that he was trained to arrest for this violation.

**Defendant City Engages in a Pattern and Practice of the Use of Excessive Force Against African-Americans in Violation of the Fourth Amendment of the United States Constitution**

117)     Defendant City's officers, including Defendant Wilson, have a pattern and practice of using unreasonable and excessive force against African-Americans, including, but not limited to, shooting, deploying electronic weapons, and the use of canines as sordid mechanisms to inflict force against African-Americans in violation of the Fourth Amendment's right to be free from excessive force and Fourteenth Amendment's right to equal protection.  Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions.  By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

118)     The FPD often escalate encounters with African-Americans, as did Defendant Wilson against MBJ, when they perceive African-Americans to be disobeying their orders or resisting arrest.

119)     Such repeated habits created a culture of unjustified police conduct within the City, which led directly to the unjustified killing of MBJ.

120)     For example, by using profanity like "get the f**K" out of the street, using police vehicles as weapons of aggression, and unreasonably releasing canines on unarmed subjects and/or by using deadly force before attempting to use force less likely to cause death, FPD officers unnecessarily escalated encounters.

121)     FPD officers frequently use this unconstitutional escalation for punitive and retaliatory purposes, and in response to behavior that may be annoying or distasteful but does not pose a threat.

122)     African-American citizens encountering police under these circumstances are rightfully confused to find themselves being detained.  They therefore refuse to stop or try to walk away, pull away incredulously, or respond with anger, believing that their constitutional rights are being violated.

123)     FPD officers, on the other hand, tend to respond with force as punishment for non-compliance with an order that lacked legal authority.  Even where FPD officers have legal authority to stop, to detain, or to arrest, they frequently take actions that escalate tensions to a point that they believe the use of force is necessary.

124)     FPD officers use unconstitutional force in instances in which African-Americans express their First Amendment rights to freedom of speech and of expression, which an officer may find personally offensive but does not violate the law.  FPD officers frequently violate individuals' First Amendment rights, arresting, and/or using unnecessary and excessive force against citizens for legally protected conduct such as talking back to officers, including the use of foul language (as MBJ was accused), recording public police activities, and lawfully protesting perceived injustices.  FPD officers have a pattern and practice of making law enforcement decisions based on what citizens say or how they say it and overreact with unlawful uses of force to verbal challenges or slights, resulting in FPD police officers typically charging citizens with Failure to Comply, Disorderly Conduct, Interference with Officer, or Resisting Arrest.

125)     The statistics are startling and corroborate the fact that Defendant Wilson's actions were excessive.  For example, 90% of all use of force by the FPD is levied against African-American citizens.  One hundred percent (100%) of the canine bite incidents for which racial identity was available included an African-American subject.  Statistical analysis of the FPD reveals, more fully *infra*, and establishes in this case (and others), a clear racial bias against African-Americans.

126)     The following incidents are illustrative of FPD officers', such as Defendant Wilson's, use of unnecessary and excessive force and/or unconstitutional use of authority against African-Americans resulting from unlawful stops, arrests, or from officers' escalation of incidents in violation of citizens' First, Fourth, and Fourteenth Amendment rights:

a. In November 2011, officers stopped a car for speeding.  Two African-American women inside exited the car and vocally objected to the stop. They were told to get back in the car.   When the woman in the passenger seat got out a second time, an officer announced she was under arrest for Failure to Comply.  This decision escalated into a use of force.  According to the officers, the woman swung her arms and legs, although apparently not at anyone, and then stiffened her body.  An officer responded by stunning her in the leg.  The woman was charged with Failure to Comply and Resisting Arrest.

b. In December 2011, FPD officers found a fourteen-year-old African-American boy in an abandoned house and allowed a dog to bite him several times.  While the dog bit the boy on the ground, FPD officers struck the child and one officer put a boot on the side of his head.  The child reported that the officers laughed about the incident.

c. In July 2012, a police officer arrested a business owner on charges of Interfering in Police Business and Misuse of 911 because she objected to the officer's detention of her employee.  The officer had stopped the employee for "walking unsafely in the street" as he returned to work from the bank.  According to FPD records, the owner "became verbally involved," came out of her shop three times after being asked to stay inside, and called 911 to complain to the Police Chief.  The officer characterized her protestations as interference and arrested her inside her shop.  The arrest violated the First Amendment, which does not allow such speech to be made a crime.  The decision to arrest the woman after

she tried to contact the Police Chief suggests that he may have been retaliating against her for reporting his conduct.

d. In September 2012, an officer stopped a 20-year-old African-American man for dancing in the middle of a residential street. The officer obtained the man's identification and ran his name for warrants. Finding none, he told the man he was free to go. The man responded with profanities. When the officer told him to watch his language and reminded him that he was not being arrested, the man continued using profanity and was arrested for Manner of Walking in Roadway.

e. In September 2012, a FPD officer stunned a handcuffed African-American woman who he had placed in the back of his patrol car, because she stretched out her leg to block him from closing the door.

f. In October 2012, an FPD officer purportedly sought to check on an African-American pedestrian's well-being, and then took him to the ground, stunned him twice, and arrested him for Manner of Walking in Roadway and Failure to Comply. The African-American man was walking after midnight in the outer lane of West Florissant Avenue when an officer asked him to stop. The officer reported that he believed the man might be under the influence of an "impairing substance." When the man kept walking, the officer grabbed his arm; when the man pulled away, the officer forced him to the ground. Then, for reasons not articulated in the officer's report, the officer decided to handcuff him, applying his electronic weapon in stun mode twice, reportedly because he would not submit his hands for cuffing. The FPD officer arrested the man, but the report failed to indicate that he was in fact impaired or doing anything other than walking down the street when approached by the officer.

g. In December 2012, a sixteen-year-old African-American boy suspected of stealing a car fled from an officer, jumped several fences, and ran into a vacant house. The officers released a canine, and as the suspect struggled with the dog biting him on the ground, the first officer deployed his electronic weapon against the suspect three times. The offense reports provided only minimal explanation for why apprehension by dog bite was necessary; officers claimed the suspect had, "reached into the front section of his waist area."

h. In January 2013, a patrol sergeant stopped an African-American man after he saw the man talk to an individual in a truck and then walk away. The sergeant detained the man, although he did not articulate any reasonable suspicion that criminal activity was afoot. When the man declined to answer questions or submit to a frisk which the sergeant sought to execute despite articulating any reason he believed the man was armed, he grabbed the man by the belt, drew his electronic weapon, and ordered the man to comply. The man crossed his

arms and objected that he had not done anything wrong. Video captured by the electronic weapon's built-in camera shows that the man made no aggressive movement toward the officer. The sergeant fired the electronic weapon, applying a five-second cycle of electricity and causing the man to fall to the ground, and he immediately fired again which he later justified in his report by claiming that the man tried to stand up. The video capturing the incident showed that the man never tried to stand but writhed in pain on the ground. The video depicted a twenty second cycle of electricity, as opposed to five seconds cited in his report. The man was charged with Failure to Comply and Resisting Arrest, but no independent criminal violation.

i.  In May 2013, officers stunned a handcuffed African-American man and punched him in the face and the head, because he verbally refused to get out of the back seat of a police car. The man did not physically resist arrest or attempt to assault the officers. The allegation was neither reported by the involved officers nor investigated by their supervisor, who summarily dismissed the allegation.

j.  In November 2013, a FPD correctional officer fired an electronic weapon at an African-American woman because she did not follow his verbal commands; her conduct amounted to verbal noncompliance or passive resistance at most. Instead of attempting hand controls or seeking assistance from a fellow officer, the correctional officer deployed an electronic weapon because the woman was, "not doing as she was told."

k.  In November 2013, an African-American male was walking down the street, and an officer deemed him suspicious because he appeared to walk away when he saw the officer. The officer stopped him and frisked him, finding no weapons, and then ran his name for warrants. When the man heard the dispatcher state over the police radio that he had outstanding warrants he ran. The officer followed him and released his dog despite knowing he was unarmed, which bit the man on both arms. The officer's supervisor found the force justified because the officer released the dog "fearing that the subject was armed," even though the officer had already determined the man was unarmed.

l.  In February 2014, officers responded to a group of African-American teenage girls "play fighting" in an intersection after school. When one of the schoolgirls gave the middle finger to a White witness who had called the police, an officer ordered her over to him. One of the girl's friends accompanied her, the officers ordered her to leave and then attempted to arrest her when she refused though she posed no threat and had a right to be there. Officers used force to arrest the friend as she pulled away. When the first girl grabbed an officer's shoulder, they used force to arrest her, as well. Officers charged the two teenagers with a variety of offenses, including: Disorderly Conduct for giving the middle finger and using obscenities; Manner of Walking for being in the street; Failure to Comply

for staying to observe; Interference with Officer; Assault on a Law Enforcement Officer; and Endangering the Welfare of a Child (themselves children) by resisting arrest and being involved in disorderly conduct. This incident underscores how officers' unlawful response to activity protected by the First Amendment can quickly escalate to physical resistance, resulting in additional force, additional charges, and increasing the risk of injury to officers and members of the public.

**Defendant City Engages in A Pattern and Practice of Perpetuating Racial Bias Against African-Americans in Violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution**

127) Defendant City's law enforcement practices are directly shaped and perpetuated by both racial animus and racial bias in violation of the Fourteenth Amendment's Equal Protection Clause prohibiting discriminatory policing on the basis of race.

128) The FPD practices disproportionately harm African-Americans.

129) Such practices created a culture of unjustified police conduct within the City, which led directly to the unjustified killing of MBJ.

130) In particular, the FPD actions impose a disparate impact on African-Americans in virtually every aspect of law enforcement, to wit: from the initial police contact to the final disposition of a case. Although the FPD's data collection and retention practices are deficient in many respects, the available data collected by the USDOJ in its investigation is sufficient to allow for reliable analysis evidencing racial disparities that cannot be explained away by chance or by any difference in the rates upon which people of different races adhere to the law.

131) African-Americans in the city of Ferguson bear the overwhelming burden of FPD's pattern of unlawful stops, searches, and arrests with respect to these highly discretionary ordinances.

132)     Despite making up 67% of the population, African-Americans accounted for 85% of FPD's traffic stops, 90% of FPD's citations, and 93% of FPD's arrests from 2012 to 2014.

133)     Furthermore, African-Americans account for 95% of Manner of Walking charges; 94% of all Failure to Comply charges; 92% of all Resisting Arrest charges; 92% of all Peace Disturbance charges; and 89% of all Failure to Obey charges.

134)     In addition, African-Americans are 2.00 times more likely to receive a citation during a vehicle stop, 2.37 times more likely to be arrested, and are more likely to receive multiple citations during a single incident.

135)     From October 2012 through July 2014, African-Americans received four or more citations on 73 occasions, whereas non-African-Americans received four or more citations only twice during that period.  African-Americans are 2.07 times more likely to be searched during a vehicular stop but are 26% less likely to have contraband found on them during a search.  The lower rate at which officers find contraband when searching African-Americans indicates either that officers' suspicion of criminal wrongdoing is less likely to be accurate when interacting with African-Americans or that officers are more likely to search African-Americans without any suspicion of criminal wrongdoing, suggesting either explicit or implicit racial animus and/or racial bias.

136)     In addition, the FPD uses force against African-American citizens at disproportionately high rates, accounting for 88% of all cases from 2010 to August 2014 in which an FPD officer reported using force.  Of the reported uses of canines which resulted in biting, 100% were African-American victims.

137)     The racially disparate impact of Defendant City's practices are driven, at least in part, by intentional discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.  Evidence of racial bias and stereotyping is made apparent by the consistency and magnitude of the racial disparities throughout the FPD's enforcement actions; the selection and execution of police practices that disproportionately harm African-Americans do little to promote public safety; the persistent exercise of discretion to the detriment of African-Americans; the apparent consideration of race in assessing threat; and the historical opposition to having African-Americans reside in the city of Ferguson.

138)     Historically, the city of Ferguson was a "sundown" city in the 1960's in which physical barriers were erected each night to prevent African-Americans from leaving certain parts of the city and entering others, with the exception of maids and people that serviced the wealthier surrounding areas.

139)     The remnants of historical racial bias and hostility toward African-Americans continue to manifest itself at the FPD.

140)     In addition to systemic or institutionalized racist practices, and the lingering effects of historical racism, many FPD officers, such as Defendant Wilson, and officials harbor explicit racial animus and racial bias as evidenced by communications among officers demonstrating racial stereotypes.  Several email messages, USDOJ interviews, and statements made by FPD supervisors and officers exhibit unequivocal derogatory, dehumanizing, and impermissible animus and bias based on race.

141)     Defendant City, through its officials, including Defendant Wilson's supervisors and commanders, all of whom were employed at the time of the incident, transmitted

messages through their official email accounts during work hours that provide unequivocal evidence of pervasive racism that permeated throughout the FPD.

142)    The following emails illustrate the sordid racial mindset that permeated the FPD:

    a. A November 2008 email stated that President Barack Obama would not be President for very long because: "what African-American man holds a steady job for four years."

    b. An April 2011 email depicted President Barack Obama as a chimpanzee.

    c. A May 2011 email stated: "An African-American woman in New Orleans was admitted into the hospital for a pregnancy termination. Two weeks later she received a check for $5,000. She phoned the hospital to ask who it was from. The hospital said, 'Crimestoppers.'"

    d. An October 2011 email included a photo of a bare-chested group of dancing women, apparently in Africa, with the caption, "Michelle Obama's High School Reunion."

143)    Defendant City, through its officials, transmitted many additional email communications that exhibited racial or ethnic bias. No employee was ever disciplined for generating or for disseminating the racist material. Nor did any recipient of a racist email ever report the correspondence or ask the sender to refrain from sending such emails, usually forwarding the email to others using government equipment and/or property.

144)    After the USDOJ published its report detailing the overtly racist correspondence found throughout Defendant City, several law enforcement officers and city officials were fired or resigned within days of its release, including the city of Ferguson's City Manager and Chief of Police, evidencing the apparent validity of the report's conclusions.

145)    FPD officers not only exchange emails using racial epithets, but they blatantly used racial epithets when addressing members of the public.

146) For example, in August 2014, an African-American man, after being pulled out of his apartment by force, told an officer, "you don't have a reason to lock me up," and he claimed the officer responded: "N*****, I can find something to lock you up on."  When the man responded, "good luck with that," the officer slammed his face into the wall, and after the man fell to the floor, the officer said, "don't pass out motherf****r because I'm not carrying you to my car."

147) In July 2014, just one month before Defendant Wilson gunned down MBJ, another young man described walking with friends past a group of FPD officers who shouted racial epithets at the young man and his friends as they passed the officers.

**The Defendant City Has A Pattern and Practice of Failing to Properly Supervise Officers, of Failing to Conduct Fair and Impartial Investigations of Alleged Officer Misconduct, and of Failing to Properly Train Officers**

148) The FPD routinely failed to properly supervise its officers and failed to conduct fair and impartial investigations into allegations of the use of excessive force by officers, thereby breeding, fostering, and supporting an environment that directly led to Defendant Wilson's unconstitutional use of force against MBJ.  Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions.  By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

149) The FPD's use-of-force review system is particularly ineffectual as officers frequently failed to report the use-of-force and supervisors performed perfunctory or no investigation.

150)    Further, the perfunctory investigation that supervisors do perform is rarely meaningful.

151)    Specifically, in the event that a supervisor does investigate use-of-force reports, they either (1) failed to comprehend or consciously disregard the FPD's use-of-force policy in analyzing officer conduct, (2) rarely corrected officer misconduct when it was identified, and/or (3) failed to see the patterns of abuse that are evident when one reviews the incidents in the aggregate.

152)    In fact, the USDOJ revealed that in 151 incident reports it reviewed, FPD first-line supervisors and the command staff found all but one of the 151 incident within policy, and the FPD Chief of Police stated to the USDOJ that he never overturned a supervisor's determination of whether a use of force fell within FPD policy.

153)    The FPD did not implement an early intervention system to identify officers who tended to use excessive force or the need for more training or better equipment choices.

154)    The aforementioned deficiencies in FPD's use-of-force review created legally deficient gaps in properly supervising FPD officers, rendering it less likely that officers will be held accountable for excessive force and more likely that constitutional violations will occur, as unfortunately illuminated in the unjustifiable killing of MBJ by Defendant Wilson.

155)    The deficiency gaps also resulted in a police department that does not give its officers the supervision they need to do their jobs safely, effectively, and constitutionally.

156)    An example of this was evident in 2010.   During that time, a senior police official complained to supervisors that every week use of force reports go unwritten and hundreds of

reports remain unapproved. He urged the supervisors that, "It is time for you to hold your officers accountable."

157)    Later in 2014, this same senior police official voiced the same complaint. This time he exclaimed that 600 reports had not been approved over a six-month period. A FPD supervisor retorted that coding errors in the new records management system is set up "to hide, do away with, or just forget reports."

158)    FPD supervisors apparently adopted a practice of justifying any level of force against citizens, primarily African-Americans, and routinely relied upon boilerplate language to do so, such as the subject took "a fighting stance" or "had a look on his face" or "made a threatening noise or sound," etc.

159)    As in this case, FPD officers regularly reported, without supervisory scrutiny, that a subject's hands were near his waist where he might have a weapon as a justification for using deadly force.

160)    Further facts evidencing FPD's failure to properly train its officers include, but is not limited to:

   a.  A failure to properly train in constitutional detentions, seizures, and arrests;

   b.  A failure to properly train in de-escalation techniques to avoid or minimize force;

   c.  A failure to properly train on the timely and proper reporting of uses of force;

   d.  A failure to properly train on racial sensitivity in constitutional policing which requires equal treatment on the basis of race in law enforcement, especially in a community with a large minority population; and

   e.  A failure to properly train supervisors on how to review officer uses of force to detect patterns of misconduct and (1) to determine whether officers are behaving in racially biased manners, (2) to identify problematic officers, and (3)

to know when to implement additional and/or new training to prevent constitutional violations.

161)    Defendants City and Jackson allowed FPD to develop and promulgate customs, policies, and/or practices of unconstitutional conduct in violation of the Fourth Amendment of the Constitution of the United States, including but not limited to:

   a.  Conducting stops and/or detentions without reasonable suspicion;

   b.  Affecting arrests without probable cause;

   c.  The use of unnecessary and unreasonable excessive force against its citizens;

   d.  Creating an atmosphere reminiscent of a police state, wherein officers felt free to confront citizens at their discretion and without any lawful authority, i.e., for simply crossing the street, for speaking in a manner in which an officer did not approve, etc.; and

   e.  Frequently escalating routine matters by issuing unlawful orders, using profane language toward citizens, physically and/or geographically restraining individuals' movement, unlawfully demanding identification, and retaliating against individuals with the excessive use of force when citizens remind officers of their constitutional rights to freedom of speech and to bodily integrity.

162)    The disproportionate frequency upon which Defendants used various forms of excessive force against members of the African-American community violated the Equal Protection Clause of the Fourteenth Amendment.  Such forms included but are not limited to:

   a.  Shooting citizens with guns;

   b.  Shooting them with electronic weapons;

   c.  Deploying canines; and

   d.  Combine subparagraphs a-c with the fact that supervisors almost unequivocally approved or ratified unconstitutional uses of force, the FPD fostered an environment that empowered officers like Defendant Wilson to act as judge, jury, and executioner.

163)       When Defendant Wilson confronted MBJ using the pretext that he did not like the way he was walking in the street, he did so under the influence of pervasive constitutional violations and racial-animus and racial-bias existing within the FPD, as well as knowing that his conduct would be ratified and promulgated by his supervisors.

164)       Defendant Wilson used the same unlawful techniques utilized by his fellow FPD officers when he escalated the initial contact with MBJ and Witness Johnson by using profane language toward them for simply crossing the street the "wrong way."  This escalation directly contributed to MBJ being gunned down in broad daylight by Defendant Wilson.

165)       In fact, before being gunned down, MBJ was simply attempting to break-free from Defendant Wilson's unlawful contact.  But yet, Defendant Wilson escalated the situation by drawing his weapon and pointing it directly at MBJ.

166)       Even after being shot and badly bleeding, MBJ attempted to flee for his safety, not as an act of unlawful resistance but rather in a failed attempt to preserve his constitutionally guaranteed right to life.

167)       The law does not require MBJ (or any citizens) to stand still while being profanely addressed, unnecessarily assaulted, and unlawfully shot at or by Defendant Wilson.

168)        Defendants City and Jackson ratified Defendant Wilson's conduct, as is customary, by failing to reprimand him for abusing and violating MBJ's constitutional rights; namely, his right to life.

169)        As a direct and proximate cause of Defendants City and Jackson's pervasive unconstitutional policing, which frequently and disproportionately denied African-Americans of their Fourth and Fourteenth Amendment constitutional rights, as well as Defendant Wilson's

unlawful detention and use of excessive force, MBJ lost his life, and his parents, Plaintiffs, lost their son and will continue to suffer damages for the remainder of their lives.

170)     The City of Ferguson affirmatively waived any sovereign immunity rights pursuant to statute 537.600 as Defendant City specifically purchased insurance to cover the type of injuries and damages alleged in the instant lawsuit.

171)     Statute 537.600.1(1) specifically waives sovereign immunity for damages arising from the negligent operation of a motor vehicle during the course and scope of employment.

172)     Upon information and belief, Defendant City of Ferguson specifically purchased insurance for the purpose of paying for bodily injury claims, personal injury claims, and to compensate individuals for claims against law enforcement officers, and said insurance policy was in effect at the time of the incident.

173)     Bodily injury is defined in the policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  Personal injury is defined as, "injury (other than bodily injury) arising out of one or more of the following offenses: a) false arrest, detention or imprisonment;…c) Wrongful…eviction of a person from…a…premise that the person occupies…" and also defined as, "invasion of the right of private occupancy; false arrest or improper service of process."

174)     Defendants' insurance further covers medical expenses including first aide, ambulance costs, medical expenses and funeral expenses arising out of Defendant City's and/or it's employees operations.

175)     In fact the insurance policy specifically waives governmental immunity as it pertains to the overall operations of the police department and its officers.

<u>**COUNT I**</u>
**Failure To Properly Hire, Train, Supervise, Retain, and Conduct A Fair and Impartial
Investigation
(Defendant City and Defendant Jackson)**

176)     Plaintiffs re-allege and incorporate the foregoing paragraphs as if fully set forth
herein.

177)     Defendants City and Jackson have a ministerial duty to provide responsible and
effective operations of its police department.

178)     Defendants also have a ministerial duty to establish proper policies, customs,
and regulations of the police department, including but not limited to, in how to conduct their
law enforcement vehicles in a reasonable and prudent way.   Defendants also had a non-
discretionary duty to drive, conduct, and otherwise use their law enforcement automobiles in a
reasonable and prudent way.

179)     Upon information and belief, prior to the death of MBJ, Defendants City and
Jackson had a custom or policy of negligently hiring and retaining officers, failing to properly
train and/or supervise officers in the use of deadly force in areas of the city of Ferguson
predominately populated by African-Americans, and in failing to conduct fair and impartial
investigations.  Furthermore, on the date of the incident, Defendant Darren Wilson conducted
his automobile in an unreasonable manner, by blockading the path of Michael Brown using his
automobile, by striking him with the door of the car, and by shooting Michael Brown while still
seated inside of the automobile.  All of this violated non-discretionary duties of Defendants.

180)     Defendant Jackson failed to ensure Defendant Wilson had the proper training,
instruction, supervision and oversight, so as to ensure that he did not negligently use his
automobile or otherwise utilize and/or conduct his automobile in an unlawful manner.

Defendant Jackson and Defendant City created and/or promulgated a policy and/or practice of allowing officers to negligently and recklessly operate motor vehicles as evidence by his failure to intervene and/or reprimand Defendant Wilson for his negligent and/or reckless and unlawful use of his law enforcement vehicle. Defendant Jackson's knowledge of said incident, and his prior and subsequent actions created, promulgated and/or ratified negligent and/or unlawful operation of motor vehicles. That, along with his failure to intervene and/or take any corrective action to prevent future harm, provides evidence of his reckless indifference to the rights of citizens, in bad faith and malice, toward the citizens of Ferguson and decedent MBJ.

181)     Upon information and belief, prior to the death of MBJ, Defendants City and Jackson had a custom or policy of negligently failing to train or supervise officers regarding how to treat and properly serve in areas of the city of Ferguson predominately populated by African-Americans. Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

182)     Upon information and belief, prior to the death of MBJ, Defendants City and Jackson had a custom or policy of negligently failing to train or supervise officers in cultural diversity in an effort to eliminate the potential of unjustified deadly force in areas of the city of Ferguson predominately populated by African-Americans. Defendant Jackson had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, Defendant Jackson created, promulgated, and effectively ratified and furthered the practice

of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

183)     Upon information and belief, Defendants City and Jackson have not formally amended its training and/or policies to eradicate similar instances of unjustified use of deadly force, further exhibiting reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

184)     The wrongful death of MBJ was directly and proximately caused by the failures of Defendants City and Jackson to fulfill their ministerial duties and, as such, produced or contributed to police officers' devaluation of African-American life in the city of Ferguson, resulting in a reckless indifference, bad faith, and malice toward the citizens of Ferguson including decedent MBJ.

**COUNT II**
**Unconstitutional Stop and/or Detention and Use Of Excessive Force in Violation of Amendments IV And XIV of the United States Constitution and 42 U.S.C. § 1983 (Defendant Wilson)**

185)     Plaintiffs hereby incorporate all above paragraphs as though fully set forth herein.

186)     This Count is being brought against Defendant City and Defendant Wilson in his individual capacity, pursuant to the United States Constitution Amendments IV and XIV and 42 U.S.C. § 1983 and § 1988.

187)     At all times material hereto, Defendant Wilson was an employee Defendant City and acting within the course and scope of his employment with same and acting under color of law.

188)     On August 9, 2014, Defendant Wilson unlawfully detained and/or seized MBJ.

189)     Defendant Wilson used unnecessary and excessive force on MBJ depriving him of bodily integrity, life, liberty, and due process of law.

190)     Upon information and belief, the decision to approach MBJ and to violate his constitutional rights was due in part to the fact that MBJ was African-American.

191)     Defendant Wilson initially encountered MBJ because he did not like the manner in which he was walking in the road.

192)     Such dislike did not provide Defendant Wilson with the lawful authority to conduct a stop or to detain MBJ.

193)     Defendant Wilson escalated the situation by using profanity toward MBJ and Witness Johnson when it was unnecessary unjustified.

194)     Defendant Wilson further escalated the situation by (1) throwing his car in reverse and using his motor vehicle as a physical barricade against MBJ, (2) striking MBJ's body with his door, (3) physically engaging MBJ from inside the vehicle, and then (4) shooting MJB while inside the vehicle.

195)     This unlawful interaction culminated with Defendant Wilson firing a total of twelve shots at MBJ, either as MBJ was attempting to flee, in the process of fleeing, surrendering with his hands up or with his body falling to the ground.

196)     Of the twelve shots fired, Defendant Wilson shot MBJ's body six to eight times, including twice in the head.

197)     The use of force exhibited by Defendant Wilson against Plaintiff MBJ was unreasonable and excessive.

198)     As a direct and proximate result of said Defendant City and Defendant Wilson's acts, omissions, and use of excessive force, MBJ was deprived of his rights to be free from unreasonable detention, due process of law, equal protection, and the right to life guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution.

**COUNT III**

**Defendant City's Custom/Policy/Pattern Practice of Unreasonable Stops and Detentions and Use of Excessive Force in Violation of the IV and XIV Amendments Of The United States Constitution and 42 U.S.C. § 1983**

199)     Plaintiffs hereby incorporate all above paragraphs as though fully set forth herein.

200)     This Count is being brought against Defendant City pursuant to the United States Constitution Amendments IV and XIV and 42 U.S.C. § 1983 and § 1988.

201)     Prior to August 9, 2014, Defendant City developed and maintained policies, customs or practices exhibiting deliberate indifference to the constitutional rights of persons in the community, including systemic deprivation of Fourth and Fourteenth Amendment rights, which caused the violation of MBJ's constitutional rights.

202)     Defendant City maintained a policy, custom, or practice of (1) conducting unconstitutional stops or detentions, (2) using of excessive force, (3) engaging in discriminatory conduct aimed at the African-American community resulting in disparate treatment, (4) failing to properly supervise and train officers on lawful detentions and uses of force, as well as the constitutional requirement of equal treatment, (5) failing to conduct fair and impartial investigations into officers' use of excessive force, and (6) failing to punish officers engaging in constitutional violations, thereby ratifying such conduct.

203)	Defendant City was aware of problems with employees', acting under the color of law, use of excessive force, and, as an employer, it failed to investigate and/or reprimand such behavior and failed to discharge said officers for their misconduct, thereby ratifying such conduct.

204)	Defendant City maintained a policy, custom, or practice of failing to properly train its police officers, including but not limited to, how to use appropriate levels of force; how to properly assess levels of threat; and how to properly issue verbal commands.

205)	Defendant City also maintained a policy, custom, or practice of failing to conduct fair and impartial investigations into officer misconduct, use of excessive force, and police shootings.

206)	Additionally, Defendant City maintained a policy, custom, or practice of treating African-American citizens differently, including the use of excessive force.

207)	The above said acts of misconduct were perpetuated, tolerated, and not reprimanded by Defendant City.  Thus, Defendant City inadequately discouraged constitutional violations perpetrated by its police officers.  As such, MBJ's constitutional rights were violated pursuant to the United States Constitution Amendments IV and XIV, and he was ultimately deprived of his bodily integrity; namely, his right to life.

208)	As a result of the above-mentioned polices, customs, and practices, Defendant City fostered an environment wherein police officers believed that their inappropriate actions would not be subject to proper monitoring by supervisors.   They also believed that their inappropriate actions would not be subject to proper investigations or lead to any kind of sanction, but would instead be tolerated by Defendant City.

209)     The above facts denote a deliberate indifference on the part of Defendant City to uphold the constitutional rights of some citizens of the city of Ferguson, as well as those visiting it.

**COUNT IV**
**Substantive Due Process Deprivation in Violation of the Amendment XIV of the United States Constitution and 42 U.S.C. § 1983**
**Defendant Wilson**
**Plaintiffs Michael Brown, Sr. And Lesley McSpadden**

210)     Plaintiffs hereby incorporate all paragraphs above as though fully set forth herein.

211)     This Count is being brought against Defendant Darren Wilson in his individual capacity, pursuant to the United States Constitution Amendments XIV and 42 U.S.C. § 1983 and § 1988.

212)     At all times material hereto, Defendant Wilson was an employee of Defendant City and acting within the course and scope of his employment with same, as well as acting under color of law.

213)     Plaintiffs Michael Brown, Sr. and Lesley McSpadden had a cognizable interest under the due process clause of the Fourteenth Amendment of the United States Constitution in being free from state actions that cause an unwarranted interference with their right to a familial relationship with Decedent, MBJ.

214)     Defendant Wilson deprived Plaintiffs of their right to a familial relationship with their son MBJ in a manner that shocked the conscience of the community.

215)     Namely, when MBJ had his hands up, Wilson fired shots at him ultimately killing him.

216)      Defendant City and Wilson left MBJ's lifeless body in the streets for hours for the community to stare, spectate, and gawk.  In so doing, Defendant Wilson acted with deliberate indifference to the constitutional rights of decedent and Plaintiffs without any legitimate law enforcement objective.

217)      As a direct and proximate result of said Defendant Wilson's acts, omissions, and deliberate indifference to Plaintiffs' constitutional right to their familial relationship with their son, Plaintiffs have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of decedent, and will continue to be so deprived for the remainder of their natural lives.

218)      Plaintiffs loved MBJ, their natural son, and Plaintiffs have suffered extreme and severe mental anguish and pain and have been injured both in mind and in body.

219)      Plaintiffs have ongoing and continuous permanent damages and injuries, and as such are entitled to recovery of damages.

### COUNT V
**Defendant City's Unconstitutional Custom/Policy/Pattern Practice of Substantive Due Process in Violation Amendment XIV of the United States Constitution and 42 U.S.C. § 1983 Plaintiffs Michael Brown, Sr. and Lesley McSpadden**

220)      Plaintiffs hereby incorporate the above paragraphs as though fully set forth herein.

221)      This Count is being brought against Defendant City pursuant to the United States Constitution Amendment XIV and violation of 42 U.S.C. § 1983 and § 1988.

222)      Prior to August 9, 2014, Defendant City developed and maintained policies, customs, or practices exhibiting deliberate indifference to the constitutional rights of persons in the community, which caused the violation of Plaintiffs' constitutional rights under the due

process clause of the Fourteenth Amendment of the United States Constitution, which protects individuals from unwarranted state interference of their right to familial relationship.

223)     Defendant City maintained a policy, custom, or practice of excessive force against citizens including inadequately and improperly investigating citizen complaints of police misconduct, and failing to properly hire, train, and supervise Ferguson officers.

224)     Defendant City was aware of problems with employees' uses of excessive force, yet effectively ratified such conduct by failing to investigate and/or reprimand such behavior, and by failing to discharge said officers for their misconduct.

225)     Defendant City maintained a policy, custom, or practice of failing to properly train Ferguson officers, including but not limited to how to properly respond to situations, how to evaluate threat and appropriate uses of force, and how to conduct themselves without employing racial bias.

226)     Defendant City maintained a policy, custom, or practice of treating African-Americans differently, including excessive use of force.

227)     The above said acts of misconduct were perpetuated, tolerated, and not reprimanded by Defendant City.  Thus, Defendant City inadequately discouraged constitutional violations perpetrated by its law enforcement officers but instead ratified such misconduct, including the use of excessive force.

228)     The above facts denote a deliberate indifference on the part of Defendant City to uphold the constitutional rights of citizens of the city of Ferguson, including Plaintiffs.  Namely, when MBJ had his hands up, Defendant Wilson fired shots at him that ultimately struck MBJ twice in the head.

229)     Defendant City left MBJ's lifeless body in the streets for hours for the world to stare, spectate, and gawk.

230)     Defendant City's aforementioned actions and inactions directly and proximately denied Plaintiffs substantive due process and caused the violation of Plaintiffs' right to a familial relationship with their son, MBJ.

231)     As such, Plaintiffs' constitutional rights were violated pursuant to the United States Constitution Amendment XIV.

232)     As a result of the above-mentioned polices, customs and/or practices, Defendant City's police officers believed that their inappropriate actions would not be subject to proper monitoring by supervisors, and that misconduct would not be subject to investigation or sanctions, but would instead be tolerated by Defendant City.

233)     As a direct and proximate result of said Defendant City's acts, omissions, and deliberate indifference to Plaintiffs' constitutional right to their familial relationship with their son, Plaintiffs have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of decedent, and will continue to be so deprived for the remainder of their natural lives.

234)     Plaintiffs loved MBJ, their natural son, and Plaintiffs have suffered extreme and severe mental anguish and pain and have been injured both in mind and in body.

235)     Plaintiffs have ongoing and continuous permanent damages and injuries, and as such are entitled to recovery of damages.

### **PRAYER FOR RELIEF**

**WHEREFORE**, for all of the foregoing reasons, Plaintiffs respectfully request that this

Court award damages, jointly and severally, against Defendants Wilson, City, and Jackson pursuant to the Missouri Constitution and statutes and the United States Constitution, and any and all other and further relief as this Court may deem just and appropriate, including but not limited to the following:

(a)     Loss of love, companionship, affection, care, and society;

(b)     Loss of future support;

(c)     Conscious pain and suffering;

(d)     Compensatory damages, including medical treatment for psychological damages, in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs;

(e)     Award reasonable attorneys' fees and costs to Plaintiffs;

(f)     An Order preliminarily and permanently enjoining the Defendant City's utilization of patrol techniques that demeans, disregard, or underserve its African-American population; and

(g)     An Order appointing a compliance monitor over the City of Ferguson's use of force practices and procedures for a period of five (5) years or until such time as the Court determines that the City of Ferguson has fully and effectually trained all of its police officers on the constitutional requirements of the use of deadly force.

<u>**TRIAL BY JURY**</u>

**WHEREFORE**, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated this **30th** day of July, 2015.

Respectfully submitted,

**Johnson Gray LLC**

/s/Anthony D. Gray
_____

Anthony D. Gray, 51534
7710 Carondelet Ave, suite 303
Clayton, MO 63105
Phone (314) 385-9500
Fax (314) 594-2052
agray@johnsongraylaw.com

**Parks & Crump, LLC**

/s/Benjamin Crump
_____

Benjamin Crump
*Appearing Pro Hac Vice for Plaintiffs*
240 N. Magnolia Drive
Tallahassee, FL 32301
Phone (850) 222-3333
Fax (850) 224-6679


/s/ Daryl D. Parks
_____
Daryl D. Parks
*Appearing Pro Hac Vice for Plaintiffs*
240 N. Magnolia Drive
Tallahassee, FL 32301
Phone (850) 222-3333
Fax (850) 224-6679


/s/ Jasmine Rand
_____
Jasmine Rand
*Appearing Pro Hac Vice for Plaintiffs*
240 N. Magnolia Drive
Tallahassee, FL 32301
Phone (850) 222-3333
Fax (850) 224-6679